UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
HARDAT BARON,

                Plaintiff,

-against-

MICHAEL J. ASTRUE,
Commissioner of Social Security

                Defendant.
------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
08-CV-3303 (CBA)

AMON, United States District Judge:

Hardat Baron brings this action against the Commissioner of Social Security ("the Commissioner") under 42 U.S.C. § 405(g), appealing from the Commissioner's decision denying Baron's application for Social Security Disability ("SSD") benefits and Supplementary Security Income ("SSI") disability benefits. The parties have cross-moved for judgment on the pleadings. For the reasons that follow, Baron's motion is granted and the Commissioner's motion is denied. The case is remanded to the Social Security Administration ("SSA") for further development of the record.

## BACKGROUND

### A. Procedural History

Baron applied for disability insurance benefits and SSI on August 5, 2005, (R. 54-58),[1] alleging disability due to spinal cord compression and shoulder problems. (R. 54, 70-71). The SSA denied his claim. (R. 30, 31-36). A hearing was held before Administrative Law Judge ("ALJ") Dennis O'Leary on June 11, 2007, (R. 375-402), and was continued on November 26, 2007 for cross-examination of the SSA's vocational expert, Rocco Meola ("Meola"). (R. 403-419). By decision dated December 26, 2007, ALJ O'Leary found that Baron was not disabled.

---

[1] Citations to "R. ___" refer to pages from the certified administrative record.

- 1 -

(R. 9-11). The Appeals Council denied Baron's request for review on May 27, 2008, (R. 4-6), making ALJ O'Leary's decision the final decision of the Commissioner.

B. Medical Evidence

*1. Treating Physicians*

Baron sought disability alleging spine and shoulder problems due to spinal cord compression after falling out of his bed and injuring his head. (R. 70-71, 115-70, 181-190, 238). He claimed he was unable to move his hands and feet after falling, (R. 159), and a CT scan determined that he had suffered a disc herniation at the C3-C4 level of the cervical spine with resultant mild to moderate compression of the cervical cord. (R. 144, 147, 166). He underwent spinal surgery on June 1, 2005, when Dr. Harrison Mu performed decompression and anterior cervical disc fusion of the cervical spine at C3-C4. (R. 161-163, 203-204). After the surgery, Baron exhibited weakness in his arms, had difficulty walking and was diagnosed with diabetes mellitus. (R. 115-116). During a post-surgery follow-up visit on July 26, 2005, Dr. Mu found Baron had good motor strength in both arms but residual numbness in his fingers. (R. 180).

On October 27, 2005, Baron saw Dr. Allan Cohen, a family practitioner, complaining of bilateral shoulder pain and seeking a refill of his hypertension medication. (R. 312). A physician's assistant examined Baron and assessed poorly controlled hypertension and bilateral frozen shoulder. Id. Dr. Cohen prescribed Atenolol, Cozaar and Norvasc, and instructed Baron to take Motrin for his shoulder pain. Id.

Baron returned to Dr. Cohen on January 18, 2006 complaining of severe shoulder pain going down both arms to his hands. (R. 313). He complained of pain when he used his muscles, particularly when exercising the arms and shoulders, and that his symptoms had not improved

since surgery. Id. Dr. Cohen prescribed Flexeril for pain and referred Baron to an orthopedist. Id.

On February 6, 2006, Dr. Lev Aminov, an internist, conducted an initial consultation. (R. 274-276). Baron complained of low back pain that radiated to his feet, as well as sexual dysfunction. (R. 274). His gait was antalgic and he walked with a cane. (R. 275). Both shoulders exhibited tenderness and decreased range of motion, and tandem walking was difficult due to pain. Id. Dr. Aminov diagnosed low back pain, rule out lumbosacral radiculopathy secondary to lumbar intervertebral disc displacement, derangement of both shoulders, and lumbosacral myofascial pain syndrome. Id. He prescribed Soma and Piroxicam, and recommended that Plaintiff avoid lifting heavy objects or sitting for prolonged periods of time. (R. 275-276). Dr. Aminov stated that Baron was "totally disabled from his regular job duties." (R. 276).

Baron returned to Dr. Cohen to address his hypertension on March 2, 2006. (R. 314). Dr. Cohen observed a painful range of motion in the upper and lower extremities, and diagnosed hypertension, diabetes mellitus, spinal cord injury, allergic rhinitis and erectile dysfunction. (R. 315).

Dr. Aminov re-examined Baron on August 28, 2006. (R. 299). Dr. Aminov reported tenderness and spasticity on palpitation with decreased range of motions in the lower back and both shoulders. Id. There was decreased muscle strength in both shoulders, and sensation was slightly decreased along the C6-7 and L5 distributions. Id. EMG testing revealed mild to moderate signs of irritation in the L5 nerve root distribution on the left side, and Dr. Aminov diagnosed lumbosacral radiculopathy and derangement of both shoulders. Id. Prognosis was guarded, and he opined that Baron was "totally disabled from his regular job duties." Id.

In the fall and winter of 2006, Baron was treated at Park Health Center where it was noted that he had tenderness over the lumbosacral area. (R. 298). He was diagnosed with acute bronchitis, lumbosacral radiculopathy and derangement of both shoulders. (R. 297). He returned to Park Health Center throughout 2006 and 2007. On October 31, 2007, Dr. Michael Tugetman reported that Baron was being treated for diabetes, hypertension and spinal cord injury, and found that Baron suffered "considerable radiculopathy of the cervical and lumbar spines as well as internal derangement of both shoulders." (R. 374). Dr. Tugetman opined that Baron was "totally and permanently disabled." Id.

*2. Consultative Physicians*

On September 27, 2005, Baron underwent a consultative examination by Dr. Kautilya Puri at the request of the New York State Disability Determination Division. (R. 243-246). Baron explained that he had fallen and injured his neck in May 2005. He stated he had improved since surgery but had some pain bilaterally in his shoulders, hands and fingers, with associated numbness that increased with movement and decreased with medication. (R. 243). His gait was normal, and he was able to walk on heels and toes without difficulty. (R. 244). He used no assistive devices and needed no help changing for the examination or getting on and off the table, and was able to rise from a chair without difficulty. Id.. Baron had full range of motion of the shoulders, elbows, forearms and wrists bilaterally. Id. Dr. Puri diagnosed a history of traumatic spinal cord injury, status post cervical spine injury, high blood pressure, diabetes mellitus and depression. (R. 246). Dr. Puri opined that Baron had no objective limitations to gait, activities of daily living, communication or fine or gross motor activity, and recommended that he not lift any heavy weights. Id.

Due to Baron's complaints of depression, he was evaluated by Steven Futrell, Ph.D., a psychologist, on September 27, 2005. (R. 239-42). After a consultation, Dr. Futrell diagnosed mild adjustment disorder with depressed mood. (R. 241).

On October 24, 2005, Dr. Jerome Kessel, M.D., a state agency review physician, reviewed Baron's file and concluded that his depressive symptoms did not fulfill the criteria for a major depressive disorder. (R. 253). Dr. Kessel opined that Baron was not significantly limited by a mental impairment, (R. 249) and felt that he was not significantly limited in any areas of work function. (R. 264-66).

C. Vocational Evidence

Rocco Meola, a vocational expert, submitted written interrogatories to ALJ O'Leary on June 18, 2007, after Baron's initial hearing. (R. 108-11). Meola identified Baron's past work as a packer/framer as semi-skilled medium work, and his job as a baggage handler as unskilled heavy work. (R. 108). The ALJ submitted questions to Meola based on a hypothetical individual of Baron's age, education and work experience who was restricted to light work, cannot lift his arms above his shoulders, must alternate standing and sitting at will, and must avoid continual and repetitive fine fingering manipulation and repetitive sideways movements of his neck. (R. 109). Meola stated that Baron's packer/framer skills were not transferable to jobs that could be done by such a hypothetical claimant. Meola further stated that the hypothetical individual could not do Baron's past relevant work but could perform other jobs in the national economy. Meola identified four unskilled, light labor positions: weigher, gate guard, garment sorter and sealing machine operator. Meola stated that these jobs exist in aggregate numbers of 2,500 in the regional economy and in excess of 640,000 in the national economy (R. 110), but

did not specify the numbers attributable to each position in either the regional or the national economy.

On July 24, 2007, Benjamin Gastel conducted a vocational evaluation at Plaintiff's counsel's request. (R. 320-32). Gastel concluded that Baron did not have "any residual functional capacity or vocational capacity to return to the job market" and was not employable. (R. 329).

## DISCUSSION

Under 42 U.S.C. § 405(g), the Court reviews the Commissioner's decision to determine whether it was supported by substantial evidence in the record as a whole or was based upon an erroneous legal standard." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). Where there is reasonable doubt as to the Commissioner's application of the correct legal standards, even if the Commissioner's decision is arguably supported by substantial evidence, the Court cannot affirm that decision. Johnson, 817 F.2d at 986. If the correct legal standard was applied and substantial evidence supports the Commissioner's decision, then the Court must affirm the final decision. See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (citing 42 U.S.C. § 405(g)); Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). It is not for the Court to determine de novo whether a claimant is disabled. Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams v. Bowen, 859 F.2d 255, 256 (2d Cir. 1988).

The Commissioner uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. The Commissioner first determines whether the claimant is working; if he is engaging in substantial gainful activity, the claim will be denied without consideration of any medical evidence. 20 C.F.R. § 404.1520(a)(4)(i), 404.1520(b). If the claimant is not working, the Commissioner determines whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c). If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 to 20 C.F.R. Supbart P of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity ("RFC") to perform his past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e)-(f), 404.1560(b). The claimant bears the burden of proving that he cannot return to his former type of work. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995). If the claimant's RFC does not permit him to engage in his prior work, the fifth and final step requires the Commissioner to determine whether the claimant, in light of his RFC, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." See Decker V. Harris, 647F.2d 291, 298 (2d Cir. 1981); 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g). If he cannot, benefits are awarded. Dixon v. Heckler, 785 F.2d 1102, 1103 (2d Cir. 1986).

In this case, it is undisputed that ALJ O'Leary properly found that Baron would not be able to perform his past relevant work based on his RFC and that Baron has thus satisfied his burden of proof at step four. (R. 21). The sole question before this Court is whether the Commissioner's finding that Baron retained the capacity for light work and could perform a substantial number of jobs in the national economy is free from legal error and supported by substantial evidence.

When a claimant's impairments prevent him from performing his past work, the burden shifts to the Commissioner to prove that the claimant is capable of working. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). In satisfying this burden, the Commissioner must produce evidence to show alternative employment that exists in significant numbers in the national economy. Id. As a general matter, the Commissioner can satisfy this burden by relying on the applicable medical vocational guidelines ("the grids"). Id. But where, as here, the claimant's physical limitations differ from the descriptions in the guidelines, the Commissioner must adduce testimony through a vocational expert, or other similar evidence, that jobs exist in the national economy that the claimant can obtain and perform. Id. Such an expert may rely on information available in governmental and other publications, such as the Dictionary of Occupational Titles ("DOT"). See 20 C.F.R. §§ 404.1566(d), 416.966(d); see also Sanchez v. Barnhart, 329 F. Supp.2d 445, 449 (S.D.N.Y. 2004); Peralta v. Barnhart, No. 04-CV-4557 (JG), 2005 WL 1527669 at *11 (E.D.N.Y. Jun. 22, 2005). The ultimate responsibility for determining the claimants capabilities based on all the evidence, however, rests solely on the ALJ. Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

Here, ALJ O'Leary found that Baron's severe impairments were orthopedic disorders and diabetes mellitus, but that they did not meet or equal the criteria in Subpart P, Part 404 of the

regulations. (R. 18-19). The ALJ found that Baron could not perform his past work as a baggage handler or picture framer, and that Baron would not be able to perform either heavy lifting or fine fingering. (R. 21). Based on Meola's vocational testimony, the ALJ found that, despite his impairments, Baron retained the ability to perform light work limited to jobs that did not require lifting above his shoulders, continual and repetitive fine manipulation, or continual and repetitive sideways movements of the neck, and that permitted him to alternate sitting and standing. (R. 18-19).

Baron raises two primary objections to the ALJ's determination that he could perform light work subject to the above limitations. First, Baron alleges that the ALJ erred in submitting a hypothetical to the vocational expert that asked for jobs in which a hypothetical claimant would be able to "alternate sitting and standing at his election," rather than specifying particular amounts of time that Baron would be required to sit and stand. Second, Baron contends that the vocational expert's testimony was flawed because Meola included a "semi-skilled" job in his recital of four "unskilled" jobs available in significant numbers in the national economy. Baron argues that this error requires a remand to the SSA.

With regard to his first argument, Baron contends that the hypothetical submitted to the vocational expert failed to properly account for Baron's limitations because the phrase "alternate sitting and standing at his election" is vague and implies an ability to stand for prolonged periods of time. Baron argues that because light work may require standing up to six hours of an eight hour day, the ALJ's hypothetical should have identified specific amounts of standing and walking required under Baron's RFC. He notes that Dr. Aminov's 2006 report states that Baron walked with an "antalgic gait" with the use of a cane," (R. 275) and that tandem gait testing was difficult to perform due to pain. Baron argues that the ALJ's instructions could have led the

vocational expert to believe that Baron would be able to stand for prolonged periods of time so long as he could sit occasionally at his election, and that this conclusion is unsupportable.

In determining Baron's RFC, ALJ O'Leary noted only that Baron's treating physician, Dr. Aminov, recommended avoiding "heavy work" and "long periods of sitting". (R. 20). The Commissioner argues that the ALJ reasonably inferred that Dr. Aminov did not intend to include the ability to stand among Baron's proscribed exertional activities. See Def. Reply Mem. at 2-3.[2] The Commissioner argues that Baron's primary complaints related to his cervical spine and shoulders, not lumbosacral pain. But Dr. Aminov's report also disclosed that Baron walked with an "antalgic gait" and required the use of a cane, a fact that appears to be encompassed in ALJ O'Leary's hypothetical to the vocational expert seeking positions that permit sitting or standing at the worker's election. In August 2006, Dr. Aminov conducted EMG testing that confirmed mild to moderate irritation of the L5 nerve root and diagnosed lumbosacral radiculopathy. (R. 299). These findings are bolstered by Dr. Tugetman's report in October 2007, which states that Baron suffered "considerable radiculopathy of both the cervical and lumbosacral spines". (R. 374). It would not be reasonable to ignore these findings and conclude that Baron suffered no limitations in standing, and such a determination is not supported by substantial evidence.

The Commisisoner cites to a variety of cases from outside this district for the proposition that an ALJ is not required to provide additional details about a sit/stand option so long as the vocational expert assumes that the plaintiff can sit and stand at will. See, e.g., Taylor v. Astrue, No. 03:09-CV-346-J-TEM, 2009 WL 3232135, at *7-8 (M.D. Fla. Sept. 29, 2009) (no error where ALJ failed to provide additional "details" about plaintiff's need for a sit/stand option where expert was asked to assume plaintiff could do light work with the option to sit or stand at

---

[2] Citations to "Def. Reply Mem." refer to the "Reply Memorandum of Law in Further Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion" submitted on November 10, 2009.

- 10 -

will); Hare v. Astrue, No. 7:08-CV-36-FL, 2009 WL 873993, at *21-22 (E.D.N.C. Mar. 29, 2009) (no error where ALJ did not specify the frequency of plaintiff's need to change positions with a sit/stand option at will); Staples v. Astrue, Civ. No. 08-200-B-W, 2009 WL 232496, at *2-3 (D. Me. Jan. 29, 2009) (ALJ sufficiently communicated restrictions on light work to vocational expert when he described "a need for an option to 'sit and stand whenever you want'") (internal alterations omitted).

In this case, the vocational expert's testimony makes clear that he did not in fact account for a sit/stand option at the claimant's election. At a supplemental hearing, the vocational expert testified that the garment sorter position, one of four jobs allegedly meeting the criteria of the ALJ's hypothetical, could not be performed by an individual incapable of standing for "prolonged periods of time." Specifically, he testified:

> Q. Okay. With regard to your other possible job, the garment sorter, where you mention it's a light job and Mr. Gastel agrees that it's also a light job, would you agree that the individual would have to be able to use their hands and arms in order to raise them above their shoulder level to raise them up?
>
> A. If they do, it may be infrequently. The garment sorters that I'm aware of that do sort, they sort basically at table height . . .
>
> Q. And as a light position, [the garment sorter job] would be done in a standing position then?
>
> A. Correct.
>
> Q. Okay. And, again, if an individual was incapable of standing for prolonged periods of time, that would preclude the person from engaging in this type of work activity?
>
> A. That's correct.

(R. 411-412). The record does not support a conclusion that the garment sorter position could be performed in a manner that allows sitting or standing at the worker's discretion. Rather, the

- 11 -

vocational expert's testimony appears to flatly contradict the plain language of the ALJ's hypothetical, namely, that Baron would need to alternate sitting and standing. The SSA's own guidelines state that "alternate sitting and standing" is required where an individual is "not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated for most light work." See SSR 83-12 at 3. Meola agreed that a person who could not stand for "prolonged periods of time" would not be able to perform the duties of the job. Such testimony is consistent with ordinary light work without limitation and appears to directly contradict the parameters of ALJ O'Leary's hypothetical.

Baron's second argument further calls the vocational expert's testimony into question. Meola identified four allegedly unskilled jobs that exist in significant numbers in the national economy: weigher, gate guard, garment sorter and sealing machine operator. According to the DOT, however, the gate guard job should not have been considered "unskilled". See DOT #372.667-030 (gate guard job carries a specific vocational preparation (SVP) of 3); SSR 00-4p (indicating that a SVP of 3-4 refers to semi-skilled work). As such, it appears that neither the gate guard nor the garment sorter position should properly have been considered under the ALJ's hypothetical.

The Commissioner contends that there "needs to be only one occupation in which there is a significant number of jobs." See Def. Reply Mem. at 5; see also 20 C.F.R. §§ 404.1566(b) (a significant number of jobs must exist in "one or more occupations"), 416.966(b) (same). Even excluding the gate guard and garment sorter positions, it is entirely possible that the remaining two jobs exist in significant numbers. Because, however, the vocational expert only provided the aggregate numbers of the four jobs, the Court cannot say with certainty that the remaining two

jobs exist in significant numbers. Confronted with a similar issue, other district courts in this circuit have remanded the case to the ALJ for further development of the record. In Sanchez v. Barnhart, 329 F. Supp.2d 445, 452-454, the vocational expert testified before the ALJ that the claimant could perform work within the sedentary to light exertional range, but two of the four jobs he identified consisted of medium work. The ALJ did not inquire about the discrepancy between the testimony presented and the DOT classification of the medium work job. The Sanchez court remanded the case to the ALJ, noting that the court was "in no position to conclude that the remaining two jobs exist in sufficient numbers in the national and local economy as to satisfy the fifth prong of the disability test and preclude remand." Id. at 454. The ALJ was instructed to inquire into the nature of the discrepancy between the expert's testimony and the DOT classifications, and make "a precise and informed decision in applying the medical evidence to the universe of jobs available in the economy". Id.; see also Peralta v. Barnhart, No. 04-CV-4557(JG), 2005 WL 1527669 at *12-13 (E.D.N.Y. Jun. 22, 2005) (citing Sanchez).[3] This case is materially indistinguishable from Sanchez and a remand is appropriate.

CONCLUSION

For the reasons set forth above, the case is remanded to the ALJ for additional administrative proceedings. On remand, the ALJ is directed to determine Baron's ability to sit and stand during an eight hour work day and, if necessary, should obtain additional information from Baron's treating physicians in order to determine his RFC. If a vocational expert provides additional testimony, the ALJ is directed to inquire about any possible conflict between the

---

[3] In Peralta, the vocational expert identified a gate guard as one of the positions available to the claimant. In that case, the vocational expert stated that there were 55,000 gate guard jobs in the local New York area and 1,250,000 nationally, and represented nearly 80% of the total jobs available for the claimant. 2005 WL 1527669 at *12. That fact is not determinative here, but underscores the extent to which the removal of a single job from the vocational expert's testimony can affect the number of jobs available to a claimant.

expert's testimony and any information provided in the DOT. See SSR 00-04p (adjudicator has affirmative responsibility to ask about conflicts with DOT when vocational expert provides evidence). The Clerk of the Court is directed to enter judgment in accordance with this Order.

SO ORDERED.

Dated: Brooklyn, New York
February 16, 2010

s/Hon. Carol B. Amon
_____
Carol Bagley Amon
United States District Judge